**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 18-cv-01896-CMA-NYW

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

     Plaintiffs,

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY,
TRAVELERS CASUALTY AND SURETY COMPANY, *f/k/a* The Aetna Casualty and
Surety Company, and
HOLCIM (US) INC.,

     Defendants.

---

**ORDER DENYING UNDERWRITERS' MOTION FOR SUMMARY JUDGMENT,
GRANTING HOLCIM'S CROSS MOTION FOR SUMMARY JUDGMENT,
AND GRANTING IN PART AND DENYING IN PART HARTFORD AND
TRAVELERS' CROSS MOTIONS FOR SUMMARY JUDGMENT**

---

     This matter is before the Court on Plaintiffs Certain Underwriters

("Underwriters"[1]) at Lloyd's, London's Motion for Summary Judgment. (Doc. # 73.)

Pursuant to the briefing procedure established by Magistrate Judge Nina Y. Wang (Doc.

# 60), Defendants Hartford Accident and Indemnity Company ("Hartford"), Travelers

---

[1] Lloyd's is a "marketplace where insurance investors buy and sell insurance risks." John C. Yang & Rachel E. Smith, *Law and procedure issues in insurance coverage actions—Does the court have jurisdiction over the parties and the subject matter?—Realignment and foreign insurers*, 1 Law and Prac. of Ins. Coverage Litig. § 10:14 (June 2019 Update) (footnote omitted). The "underwriters" are "individual insurance investors . . . ." *Id.* (footnote omitted). Although Plaintiff "Underwriters" is an individual entity, it is composed of various investors who have subscribed to the Underwriters policies at issue. Therefore, in this Order, the Court refers to Underwriters in the plural.

Casualty and Surety Company ("Travelers"), and Holcim (US) Inc. ("Holcim") filed combined Responses to Underwriters' Motion and Cross Motions for Summary Judgment. (Doc. ## 81, 82, 84.) Underwriters' Motion and Defendants' Cross Motions have been fully briefed in accordance with the procedure that Magistrate Judge Wang established for this case. (Doc. ## 89, 95, 97, 100, 102, 104, 106, 108.) Having thoroughly reviewed the underlying briefing, pertinent record, and applicable law, the Court denies Underwriters' Motion, grants Holcim's Cross Motion, and grants in part and denies in part Hartford and Travelers' Cross Motions.

## I.  BACKGROUND

This case involves an insurance coverage dispute. In 1967, Holcim's predecessor entity—Ideal Cement Company ("Ideal Cement")—built a cement manufacturing plant in Seattle, Washington, which later became implicated in state and federal regulatory actions arising out of alleged environmental contamination. *See* (Doc. # 73 at 2; Doc. # 81 at 3 n.1). From 1958 to 1987, Ideal Cement and/or Holcim were insured by three different insurance companies. Specifically:

- **Underwriters** issued policies[2] that were in effect from **1958 to 1970**;
- **Hartford** issued policies that were in effect from **1973 to 1979**; and
- **Travelers** issued policies that were in effect from **1979 to 1987**.

(Doc. # 73 at 4–8; Doc. # 81 at 6.)

In April 2009, the Environmental Protection Agency sent Holcim a Request for Information pursuant to § 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, which sought information regarding a particular site

---

[2] The Court will refer to these policies as the "Underwriters policies" throughout this Order.

related to the environmental contamination allegations—the Lower Duwamish Site (the "LDW Site"). (Doc. # 81 at 3–4); *see* 42 U.S.C. § 9604(e). Subsequently, in May 2009, Holcim requested a defense and indemnification from Underwriters for the LDW Site. (Doc. # 81 at 3.) In February 2010, Underwriters confirmed receipt of the LDW Site claim, and they requested further information about the Site, but Underwriters did not indicate whether they would provide a defense for Holcim. (Doc. # 81-1 at 27–31.)

In November 2012, the EPA sent Holcim a letter informing Holcim that the EPA considered it a Potentially Responsible Party ("PRP") for either the cleanup of the LDW Site or the costs the EPA incurred in cleaning up the Site. (*Id*. at 32–33.) Notably, the PRP letter did not specify an exact date or range of dates on which the alleged environmental contamination took place.[3] *See* (*id*.). Rather, the letter indicated only that "the EPA has reason to believe that hazardous substances **have been or are being** released from the facility(ies) located in Seattle, Washington, as identified in the 104(e) Information Request response." (*Id*. at 32) (emphasis added). Holcim forwarded the PRP letter to Underwriters, Hartford, and Travelers. Based on the PRP letter, Hartford and Travelers agreed to participate in Holcim's defense under reservations of rights, but Underwriters did not respond to the letter.

State and federal regulatory proceedings regarding the LDW Site have been ongoing. *See* (Doc. # 73 at 2). From 2014 to 2018, Hartford and Travelers sent Underwriters multiple requests for Underwriters to participate in Holcim's defense.

---

[3] The EPA's § 104(e) Request for Information similarly did not specify a date or range of dates on which the alleged environmental contamination took place. *See* (Doc. # 81-1 at 7–20).

However, Underwriters did not begin to participate until June 2018. At that time, Underwriters agreed to defend Holcim, subject to a reservation of rights, under the policies that were issued from 1964–1970. Additionally, Underwriters disclaimed any defense obligation for the time period of 1961–1964, but they did not address the time period prior to 1961. (Doc. # 81-1 at 81.)

Thereafter, Underwriters initiated the instant case seeking a declaratory judgment regarding the existence and extent of Underwriters' duty to defend Holcim based on the policies that Underwriters issued to Ideal Cement. Specifically, **Underwriters** request this Court to order that:

- By operation of the "other insurance" provision in the Underwriters Policy, Underwriters' duty to defend Holcim . . . operates excess of Hartford's and Travelers' duties to defend Holcim . . ., and Underwriters defense obligation is not implicated until the limits of liability in the Hartford and Travelers policies have been exhausted;
- By operation of the "other insurance" provision . . ., Underwriters have no legal or equitable obligation to share in or contribute to any defense provided to or on behalf of Holcim . . . by Hartford or Travelers . . .; and
- Underwriters defense obligation to Holcim . . . is further contingent on Holcim's full satisfaction of its annual $25,000 self-insurance obligation . . .

(Doc. # 73 at 20–21).

In its Cross Motion for Summary Judgment, **Holcim** seeks an order from this Court that:

- Underwriters, Travelers[,] and Hartford each has a current, joint-and-several duty to Holcim to provide a full and complete defense, and . . .
- Underwriters breached [the duty to defend] when they denied all defense costs before June 8, 2018.

(Doc. # 81 at 20.)

Finally, in their Cross Motions for Summary Judgment, **Hartford** and **Travelers** request for the Court to enter an order finding that:

- Underwriters must contribute to Holcim's past and future defense costs; and
- Holcim's defense costs incurred in connection with the PRP Letter should be apportioned among the three insurers based on a "time on the risk" ("TOR") allocation.

*See* (Doc. # 82 at 20; Doc. # 84 at 20).

## II.     LEGAL STANDARDS

### A.     DECLARATORY JUDGMENT & SUMMARY JUDGMENT

Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, the Court may enter a judgment declaring "the rights and other legal relations of any interested party seeking such declaration. . . ." 28 U.S.C. § 2201. Such a judgment or decree is reviewable as a final judgment. *Id*. In the instant case, the parties do not dispute that the issues can be resolved as a matter of law through a declaratory judgment.

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbot Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 118 F.3d 837, 839 (10th Cir. 1997).

When reviewing motions for summary judgment, a court may not resolve issues of credibility, and must view the evidence in the light most favorable to the nonmoving party—including all reasonable inferences from that evidence. *Id*. However, conclusory

5

statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

## B.    INSURANCE POLICY INTERPRETATION & THE DUTY TO DEFEND

Under Colorado law,[4] terms of an insurance policy are construed according to the principles of contract interpretation. *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004). In interpreting a contract, courts seek to "give effect to the intent and reasonable expectations of the parties." *Id*. (citation omitted). Therefore, courts assign terms in an insurance policy their plain and ordinary meaning, unless it is evident that the parties intend otherwise. *Id*. (citing *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999)); *see, e.g.*, *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1090–92 (Colo. 1991) (analyzing case law and dictionary definitions to clarify the undefined term, "sudden and unexpected"); *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 304–06 (Colo. 2003) (analyzing case law and dictionary definition to explain the ambiguous term, "property damage").

Courts also "recognize that unlike a negotiated contract, an insurance policy is often imposed on a 'take-it-or-leave-it' basis" and, therefore, courts "assume a 'heightened responsibility' in reviewing insurance policy terms to ensure that they

_____

[4] Because there is no outcome determinative conflict of law regarding the matters at issue in the current stage of litigation, the Court applies the law of the forum state. *See, e.g.*, *Bowers v. Buckeye State Mut. Ins. Co.*, No. 18-cv-00496-CMA-NRN, 2019 WL 141703, at *2 (D. Colo. Jan. 9, 2019) ("When more than one state's law may be applicable to a claim or issue, a court need not choose which body of law to apply unless there is an outcome determinative conflict between the applicable bodies of law." (citation omitted)).

comply with 'public policy and principles of fairness.'" *Id*. (citations omitted). As a result, ambiguous terms in an insurance policy are construed against the insurer. *Id*. (citing *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 166 (Colo. 1993)).

With regard to the duty to defend in particular, the Colorado Supreme Court has explained that the duty "provides notice to an insurer so that it can adequately defend against third party claims." *Id*. (citation omitted). The source of the duty to defend is contractual, and it derives from the insurance policy itself. *Id*. (citation omitted). To analyze an insurer's duty to defend, courts consider whether the factual allegations in the underlying complaint trigger coverage under an insurance policy's terms. *Id*. (citing *Cyprus*, 74 P.3d at 299 (citing *Hecla*, 811 P.2d at 1089)).

An insurer has a duty to defend where a complaint against its insured "alleges any facts that might fall within the coverage of the policy," even if allegations only "potentially or arguably" fall within the policy's coverage. *Id*. (footnote omitted) (quoting *Hecla*, 811 P.2d 1089). The duty to defend is "designed to cast a broad net in favor of coverage," and it must be construed "liberally with a view toward affording the greatest possible protection to the insured." *Id*. (quoting *Cyprus*, 74 P.3d at 297). It follows that an insurer seeking to avoid its duty to defend bears a "heavy burden." *Id*. (quoting *Hecla*, 811 P.2d at 1089). The weight of the insurer's burden "comports with the insured's legitimate expectation of a defense, and prevents the insurer from evading coverage by filing a declaratory judgment action." *Id*. (quoting *Hecla*, 811 P.2d at 1090). Once the duty to defend has been established, then the insurer must defend its insured

unless an exclusion in the insurance policy precludes coverage. *Id*. (quoting *Hecla*, 811 P.2d at 1090).

## III. DISCUSSION

In accordance with the case plan approved by Magistrate Judge Wang, this Order is limited to analyzing central policy construction issues regarding Underwriters' potential duty to defend and the related issue of the insurers' contribution in connection with the LDW Site. *See* (Doc. # 52) (adopting the parties' proposed scheduling order). The Court will also address Holcim's argument that the insurers are jointly and severally liable for its defense. Therefore, the Court will first consider the meaning and effect of the Underwriters' "other insurance" and self-insurance provisions in order to determine whether Underwriters have breached their duty to defend Holcim. The Court will subsequently consider the issue of joint and several liability as well as the proper method of allocating Holcim's defense costs among the insurers.

### A. POLICY PROVISIONS RELEVANT TO UNDERWRITERS' DUTY TO DEFEND

In the Underwriters policies at issue, the following provisions are relevant to Underwriters' duty to defend an insured:

COVERAGE. From and against all loss which the Assured may sustain or incur by reason of or in consequence of:

(a) Any and all liability imposed by law against the Assured for loss of or damage to or destruction of property of others (including but not limited to, damage resulting from loss of use of property damaged or destroyed and all other indirect and consequential damage for which legal liability exists in connection with such damage to or destruction of property of others) sustained or alleged to have been sustained during the currency of this Certificate and **arising from any cause whatsoever out of the operations, activities, work and/or business of the Assured in the United States of America** . . . , in connection with the Assured's

business consisting principally of cement manufacturing and aggregates
. . .

(c) The Underwriters also agree:

1. To investigate and/or to defend in the name and on behalf of Assured **all claims or suits** for such injury or damage for which the Assured **is, or is alleged to be** liable.

2. To pay in addition to the limits of liability . . . all expenses incurred by the Underwriters for investigation, negotiation and defense of all such **claims or proceedings**; all costs taxed against the Assured in any such proceedings . . . .

*E.g.*, (Doc. # 74 at 6) (emphasis added).

It is undisputed that the foregoing provisions establish that, under certain circumstances, Underwriters may have a duty to defend Holcim. This case turns on whether other provisions in the Underwriters policies impose conditions precedent to Underwriters' duty to defend such that the duty was not triggered by the EPA's PRP letter and related proceedings. Specifically, Underwriters argue that provisions in their policies regarding "other insurance" and self-insurance dictate that Underwriters' duty to defend does not extend to the EPA proceedings.

**B.     UNDERWRITERS' "OTHER INSURANCE" PROVISION**

In addition to the provisions explicitly referring to Underwriters' duty to defend, the Underwriters policies at issue also contain the following provision:

OTHER INSURANCE. In the event that there shall be in effect any other good, valid and collectible insurance inuring to the benefit of the Assured . . . , with respects to **loss or claim** [sic] **covered** hereby, **then this insurance shall be excess insurance only**, over and above the amount of any such good, valid and collectible insurance.

*E.g.*, (Doc. # 74 at 7) (emphasis added). Underwriters argue that the "other insurance" provision ("OIP") means "that the Underwriters Policies operate excess of the Hartford and Travelers Policies." (Doc. # 73 at 11.) As a result, Underwriters argue that their duty to defend is not triggered until the other insurers' policies have been exhausted with regard to Holcim's defense costs.

Several standard rules of contract interpretation frame the Court's analysis of whether the OIP has the effect of placing Underwriters in an excess position relative to the other insurers with regard to the duty to defend Holcim. First, "[t]he meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation." *Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 11 (citation omitted). Second, courts must construe a contract "in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Id.* (citation omitted).

Applying these principles to the instant case, the Court concludes that the plain language of the Underwriters policies indicates that the OIP does not apply to Underwriters' duty to defend an insured involved in a lawsuit.

1. <u>Based on the Plain Meaning of the Relevant Terms, the OIP does not Apply to Underwriters' Duty to Defend an Insured Involved in a Lawsuit</u>

The Underwriters' duty to defend applies to "**all claims or suits** . . . ." (Doc. # 74 at 7) (emphasis added). By contrast, the OIP applies to a "**loss or claim** . . . ." (*Id.*) Underwriters argue that any distinction between the terms "suit" and "claim" is immaterial because, "a 'claim' is a demand that may be in the form of, or treated as an equivalent of, a 'suit' . . . ." (Doc. # 89 at 9.) Taking this argument to its logical

conclusion, the word "claim" in the OIP would also apply to "suits," notwithstanding the fact that the OIP does not specifically refer to "suits." However, such an interpretation of the OIP is inapposite with the plain meaning of the relevant terms, and it is contrary to the way in which the terms are used in the policies themselves.

      *a.*     *Plain meaning of the terms, "claim" and "suit"*

Where, as here, the meaning of terms in a contract are undefined by the agreement itself, courts may refer to recognized dictionaries to determine the plain meaning of the terms. *See, e.g.*, *Sch. Dist. No. 1 in Cty. of Denver v. Denver Classroom Teachers Ass'n*, 2019 CO 5, ¶ 13. In the instant case, the relevant policies were issued between 1958 and 1970. *See supra* Section I. Therefore, dictionary definitions from that time period are instructive to ascertain the plain meaning of the terms at the time the policies were issued.

      *i.*     <u>Claim</u>

In the time period during which the Underwriters policies were issued, the word "claim" was defined as,

> A demand for money or property; the assertion of a demand, or the challenge of something, as a matter of right; a demand of some matter, as of right, made by one person upon another to do or to forbear to do some act or thing, as a matter of duty . . . ; **a demand against an insurance company for a payment of a loss**; a writing which uses words showing an intention to claim benefits under . . . insurance. . . . As used in a statute concerning claims against the state and providing for their enforcement by suit, the term is equivalent to "cause of action."

Jᴀᴍᴇs A. Bᴀʟʟᴇɴᴛɪɴᴇ, <u>Ballentine's Law Dictionary</u> 205 (William S. Anderson ed., 3d 1969) (emphasis added) (citations omitted). Additionally, Webster defined "claim" in its form as a noun as,

> [A]n authoritative or challenging request . . . a demand of a right or supposed right . . . a calling on another for something due or supposed to be due . . . a demand for compensation, benefits, or payment (as one made in conformity with provisions of the Social Security Act or of a workmen's compensation law, **one made under an insurance policy upon the happening of the contingency against which it is issued**, or one made against a transportation line because of loss occasioned by carrier negligence or overcharge); *also*: the amount or payment of such a demand . . . .

Webster's Third New International Dictionary 414 (Philip B. Grove et al. eds. 1967)

(emphasis added).

### ii. *Suit*

In the time period during which the Underwriters policies were issued, the word "suit" was defined as,

> An action; a legal proceeding of a civil kind. . . . **Any proceeding in a court of justice by which a person pursues therein that remedy which the law affords him**. . . . "It must be conceded that the word, as applied to legal controversies, both by the legal profession and others, is now used and recognized as a generic term of broad significance, often understood and used, even by legislatures and courts, to designate almost any proceeding in a court . . . ."

BALLENTINE, *supra*, at 1237 (emphasis added) (citations omitted). Additionally, Webster defined "suit" as,

> [R]ecourse or appeal to a feudal superior for justice or redress of grievances <made ~ to the king in council> . . . the attempt to gain an end by legal process: prosecution of right before any tribunal . . . **an action or process in a court for the recovery of a right or claim**: a legal application to a court for justice . . . .

Webster's Third New International Dictionary, *supra*, at 2286 (emphasis added).

A comparison of the definitions of the terms "claim" and "suit" shows that when the Underwriters policies were issued, the terms had distinct meanings. A "claim" referred to a general demand, usually in an informal context. *See supra* Section III(B)(1)(a)(i). In the context of insurance, the term referred to an insured making a demand on an insurer for the performance of a certain duty. *Id*.

A "suit" by contrast, referred to a formal proceeding in which an individual pursued a remedy provided by the law. *See supra* Section III(B)(1)(a)(ii). Therefore, by definition, the biggest distinction between the terms is that a "suit" was necessarily an adversarial concept in which a party resorted to using the assistance of the government to resolve a grievance, whereas a "claim" was not. As a consequence, the terms cannot be equated to one another; there is a fundamental difference between them.

Moreover, although Webster refers to a "claim" in the definition of the word "suit," that does not mean that the terms are synonymous. On the contrary, that reference clarifies the difference between the terms. Webster indicates that a "suit" is "an action or process in a court for the recovery of a right or claim . . . ." Webster's Third New International Dictionary, *supra*, at 2286. Accordingly, a "suit" can be conceived as a vehicle through which a "claim" may be pursued against another in a court of law—a "claim" is to a "suit" as a passenger is to a vehicle. Thus conceived, it follows that a "claim" cannot be equated to a "suit." Just as a vehicle is only one means of transporting a passenger, a "suit" is only one mechanism that is available for an individual to enforce a claim. Therefore, the terms "suit" and "claim" are distinct and not synonymous.

Importantly, the Colorado Supreme Court has held that "an EPA action under CERCLA," such as the one involved in the instant case, "is sufficiently coercive to constitute a '**suit**' . . . ." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 622 (Colo. 1999) (emphasis added).

      b.      *Usage of the terms "claim" and "suit" in the Underwriters policies*

The distinction between the terms "claim" and "suit" is further evidenced by the usage of those terms in the Underwriters policies themselves. In the provisions regarding Underwriters' duty to defend, the policies indicate that Underwriters will defend an insured from "all **claims or suits**" and from:

> all expenses incurred by the Underwriters for investigation, negotiation[,] and defense of any such **claims or proceedings**; all premiums on attachment . . . required in any such **proceedings**; all costs taxed against the [insured] in any such **proceedings**; and all interest on any judgment accruing before or after entry of such judgment and up to the date of payment by Underwriters of their share of any such judgment.

(Doc. # 74 at 6) (emphasis added). Thus, the policies refer to defending an insured regarding "claims or proceedings" immediately after indicating that the duty to defend applies to "claims and suits." Notably, legal "proceedings" are an inherent part of "suits," but not "claims." *See supra* Section III(B)(1)(a)(i–iii). Subsequently, the policies provide details about which features of "proceedings" are covered—all of the references are to elements of a lawsuit such as "attachment" and entry of "judgment." Therefore, the Underwriters policies illustrate that the terms "suits" and legal "proceedings" are distinct from general "claims." *See First Christian Assembly of God, Montbello v. City & Cty. of Denver*, 122 P.3d 1089, 1093 (Colo. App. 2005) (citing *Knisley v. Parsons*, 474 P.2d 599, 602 (Colo. 1970) ("In all cases the express words of the contract must be

interpreted in the actual context of those words and in light of all the surrounding circumstances.")).

Additionally, other provisions of the Underwriters policies similarly illustrate that the terms "suit" and "claim" are not interchangeable. For instance, the policies contain the following provision:

> COOPERATION. The Assured, when requested by the Underwriters, shall aid in effecting settlements, in securing evidence and the attendance of witnesses, in defending **suits**, and in prosecuting appeals . . . . The Assured shall not voluntarily assume any liability, settle any **claim** or incur any expense in connection with any **claims or loss** in excess of the amount(s) expressed in Items (a) and/or (b) of Paragraph No. 3 of this Certificate.

(Doc. # 74 at 7) (emphasis added). The first clause of the Cooperation provision refers to "suits" in the context of legal proceedings, whereas the second clause refers to "claims" in a context that does not contain any indication that it applies to such proceedings. Rather, the context suggests that the reference to "claims" applies to instances in which formal legal proceedings have not been initiated because the provisions regarding Underwriters' duty to defend suits indicates that suits may be settled in excess of the limits of liability, but the Cooperation provision caps settlements of claims at the limits of Underwriters liability.

The same distinction applies to the Notice of Loss provision, which indicates that,

> As soon as reasonably possible after the occurrence of every accident or loss coming under the conditions of this Certificate the Assured shall give to Underwriters written notice thereof with the fullest information attainable . . . . The Assured in like manner shall give like notice with full particulars of any **claim** made on account of such accident. If **suit** is brought against the Assured, the Assured shall immediately forward to Underwriters, summons or other process that may be served upon them.

(*Id.*) (emphasis added). As with other provisions in the Underwriters policies, the Notice of Loss provision does not use the terms "suit" and "claim" interchangeably. Rather, the provisions refer to "suits" in the limited context of legal proceedings, in conformity with that term's plain meaning, as articulated in Section III(B)(1)(a)(ii and iii). By contrast, the term "claim" is not associated with such proceedings, which also conforms with that term's plain meaning, as articulated in Section III(B)(1)(a)(i and iii).

Moreover, when a provision is intended to relate to Underwriters' duty to defend, the policies make that clear. For instance, the policies contain the following provision:

> DENIAL OF LIABILITY. In the event the Assured is self-insured, in part, against loss which may be the basis of [sic] claim under this Certificate[,] the Underwriters reserve the right to require the Assured to deny any such claim and in the event the Underwriters shall exercise their right, **the Underwriters shall defend the Assured and pay all costs in accordance with the terms set forth in Insuring Agreement C**.

(Doc. # 74 at 7) (emphasis added). Importantly, Insuring Agreement C is the section that describes Underwriters' duty to defend.

From a review of the foregoing provisions, it is apparent that Underwriters were well aware of the distinction between a loss or claim and a suit or legal proceeding. Underwriters chose to limit the application of the OIP to a "**loss or claim** . . . ." (*Id.*) (emphasis added). The provision references neither "suits" nor legal proceedings, as do some of the other provisions. Further, the OIP does not contain a reference to the duty to defend section, unlike other provisions that are intended to implicate that duty. Therefore, the way in which the terms "suit" and "claim" are used—in the Underwriters policies in general and in the OIP and duty to defend provisions in particular—shows that those terms have distinct meanings and are not interchangeable.

2. <u>The OIP is More Limited in Scope than the Duty to Defend Provision</u>

The OIP is much more limited in scope than the Duty to Defend provision. The OIP applies to "a loss or claim **covered**" by the Underwriters policies, whereas the duty to defend provision applies to "all claims or suits for such injury or damage for which the [insured] **is, or is alleged to be** liable."[5] (Doc. # 74 at 6) (emphasis added). Currently, the duty to defend provision has been triggered by the EPA's claims against Holcim. However, the OIP provision has not yet been triggered because, although Holcim is alleged to be liable for environmental contamination related to the LDW Site, the existence and extent of Holcim's liability have not been definitively determined; nor it been determined that Holcim's claims are "covered" under the Underwriters policies.[6]

In summary, the plain meanings of the terms "claim" and "suit" are unambiguously distinct. More importantly, the way in which those terms are used in the Underwriters policies shows that the terms are used in accordance with their plain meaning. Therefore, because Underwriters' duty to defend applies specifically to "suits,"

---

[5] The Underwriters' provision regarding the duty to defend complies with the Colorado legal standard applicable to that duty. Specifically, "[a]n insurer has a duty to defend where a complaint against its insured 'alleges any facts that might fall within the coverage of the policy,' **even if allegations only 'potentially or arguably' fall within the policy's coverage**." *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 502 (Colo. 2004) (emphasis added) (footnote omitted) (citation omitted).

[6] Underwriters concede that the question of whether Holcim's claim will ultimately be covered by its policies has not been resolved. *See* (Doc. # 82-2 at 21) (noting that the facts may "ultimately establish that the matter resulting in liability was not covered by the [Underwriters] Policies."). The Court finds unpersuasive Underwriters' argument that a "covered" claim "is one which, **if sustained**, would impose a liability covered by the Policies" (Doc. # 89 at 11) (emphasis added). Such an interpretation of the word "covered" in the OIP would effectively require the Court to find that "covered" means "potentially covered" without any basis for such a finding in the text of the policies.

the suit initiated by the EPA triggered Underwriters' duty to defend Holcim. Moreover, because the OIP does not apply to suits—and because it has yet to be determined whether Holcim's claim will be covered by the Underwriters policies—Holcim's claim is outside the narrow scope of the OIP. Accordingly, the OIP provision has not been triggered, and Underwriters cannot rely upon it as a shield from liability to the extent that there are other insurers who also may be liable for Holcim's defense costs.

## C.    UNDERWRITERS' SELF-INSURANCE PROVISION

With respect to Underwriters' limits of liability, the policies contain the following provision:

> The Underwriters Limits of Liability under this Certificate shall be only of the **excess of loss over** . . .
>
> (b)    SELF INSURANCE, TWENTY FIVE THOUSAND DOLLARS ($25,000.00) annually as respects any claim or series of claims arising out of any one occurrence other than as described above; and then Underwriters Limit of Liability will be such amount as will provide the Assured with total limit under the Underlying [sic] and this insurance of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) and in the aggregate TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) during any one period of insurance.

(Doc. # 74 at 5) (emphasis added). Underwriters argue that their defense obligation is contingent on Holcim's satisfaction of its self-insurance obligation. (Doc. # 73 at 17.) This argument fails for two reasons.

First, by its terms, the self-insurance provision applies to Underwriters' limits of liability, as opposed to their duty to defend. Underwriters themselves point out that the limits of liability "**concern indemnity, not defense**, as evidenced by the fact that the limits of liability are not affected by how much Underwriters may pay for Holcim's

defense but rather concern the maximum amount under the policies that Underwriters are obligated to pay for any liability imposed by law against Holcim." (*Id*. at 19) (emphasis added) (citation omitted). Thus, the self-insurance provision does not apply to Underwriters' duty to defend an insured.

Second, the self-insurance provision explicitly applies to "claims" and "losses," but not "suits." The Court has already determined that the term "claim" has a meaning that is independent from the meaning of the term "suit," which is evidenced by the definitions of those terms and corroborated by the usage of the terms in the Underwriters policies. *See supra* Section III(B)(1)(a–b). Additionally, the Court has determined that when Underwriters intended a provision to apply to its duty to defend, they made that clear. *See supra* Section III(B)(1)(b) (noting that the Denial of Liability provision made an explicit reference to the duty to defend provision). Therefore, because the self-insurance provision refers to neither "suits" nor Underwriters' duty to defend an insured, the self-insurance provision does not create a condition precedent to Underwriters' duty to defend Holcim.

D.      **HOLCIM'S BREACH OF CONTRACT CLAIM**

Holcim argues that Underwriters breached their duty to defend by denying payment of defense costs incurred before June 8, 2018. (Doc. # 81 at 7.) To recover on a breach of contract claim, a plaintiff must prove (1) the existence of a contract; (2) that the plaintiff performed its duties under the contract (or was justified in failing to do so); (3) that the defendant failed to perform the contract; and (4) resulting damages. *Amair,*

*Inc. v. Gapex Aviation SP. Z o.o.*, No. 15-CV-02596-CMA-KLM, 2019 WL 1651828, at

*4 (D. Colo. Apr. 17, 2019) (citing *Long v. Cordain*, 2014 COA 177, ¶ 19).

Additionally, to determine whether an insurer's duty to defend has been

triggered, Colorado courts adhere to a "four corners rule" or "complaint rule," under

which courts compare the allegations of the underlying complaint with the terms of the

applicable policy. *DISH Network Corp. v. Arch Specialty Ins. Co.*, 659 F.3d 1010, 1015

(10th Cir. 2011). Importantly, EPA "PRP letters are the functional equivalent of [a]

complaint in [an] underlying action against [an] insured." *Compass Ins. Co. v. City of

Littleton*, 984 P.2d 606, 615 (Colo. 1999). "In the duty to defend context, the 'complaint

rule' operates to cast a broad net, such that when the underlying complaint alleges **any**

facts or claims that **might** fall within the ambit of the policy, the insurer must tender a

defense." *DISH Network*, 659 F.3d at 1015 (emphasis added) (quoting *Cyprus*, 74 P.3d

at 301). An insurer's failure to provide a defense in such a circumstance constitutes a

breach of the insurer's duty.

Insurers have "a heavy burden to overcome in avoiding the duty to defend, such

that the insured need only show that the underlying claim may fall within policy

coverage; the insurer must prove it cannot." *Id*. (quoting *Cyprus*, 74 P.3d at 301). "This

liberal approach recognizes the reality that 'notice pleading does not contemplate detail

and specificity,'" *id*. (quoting *Cyprus*, 74 P.3d at 301), "and a complaint may initially 'lack

detail necessary to conclusively establish the duty,'" *id*. at 1015–16 (quoting *Ganim v.

Columbia Cas. Co.*, 574 F.3d 305, 307 (6th Cir. 2009)).

In the instant case, the existence of a contract is undisputed. Additionally, the Court has determined that the contract—i.e., the Underwriters policies—created a duty to defend Holcim that was neither excess to Hartford and Travelers' defense obligations nor conditioned on Holcim's self-insured obligation. *See supra* Section III(B–C). It is also undisputed that Underwriters' did not provide a defense prior to June 8, 2018.

However, Underwriters argue that, rather than breaching the contract, they were prevented from performing because Holcim failed to produce "the full 'complaint' that was necessary for [Underwriters] to examine their potential defense obligations until June 8, 2018 when Holcim submitted to Underwriters its nine-year-old July 31, 2009 Response to the EPA's PRP Letter . . . ."[7] (Doc. # 89 at 22.) Underwriters' argument is based on the premise that, even though Holcim provided the PRP letter—i.e., the complaint—to Underwriters approximately one month after Holcim received the letter in November 2012, "the full 'complaint' . . . was more than just the PRP letter." (Doc. # 81 at 4, 23.) This argument fails because Holcim's provision of the PRP letter was sufficient to put Underwriters on notice of the claims of the EPA and, thus, triggered Underwriters'

---

[7] Although Underwriters state that the 2009 correspondence that Holcim sent to the EPA was Holcim's "Response to the EPA's PRP Letter," that correspondence was actually Holcim's response to the EPA's Request for Information pursuant to § 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act. (Doc. # 81 at 3–4); *see* 42 U.S.C. § 9604(e). The liability of potentially responsible parties is covered in different sections of the statute—i.e., §§ 9606(a) and 9607(a). (Doc. # 81-1 at 32.) As the EPA explains in its Frequently Asked Questions about Information Request Letters and Identifying Potentially Responsible Parties, receiving an information request letter does not mean that the EPA has decided that the recipient is "a potentially responsible party." (*Id*. at 38.) Rather, "[i]t means that EPA has reason to believe that [that recipient] [has] information about past or current property use" and "[t]he information . . . is one of the sources EPA uses to identify potentially responsible parties." (*Id*.)

duty to defend. *See DISH Network*, 659 F.3d at 1015–16 (the duty to defend is based

on a liberal standard that does not require extensive detail).

Although the EPA's PRP letter is not a model of specificity, it does provide the

essential information that is necessary to determine whether the matter **might** fall within

the Underwriters' coverage. In particular, the PRP letter indicates:

> The EPA has evaluated information in connection with its investigation of
> the Site and believes that Holcim (US), Inc. may be a PRP with respect to
> this Superfund Site. PRPs under CERCLA include current and former
> owners or operators of the Site; as well as persons who arranged for
> treatment and/or disposal of any hazardous substances at the Site, and
> persons who accepted hazardous substances for transport and selected the
> Site to which the substances have been or are being released from the
> facility(ies) located in Seattle, Washington, as identified in the 104(e)
> Information Request response.

(Doc. # 81-1 at 33.) Therefore, the PRP letter effectively communicates that Holcim or

its predecessors may be liable for damages caused by hazardous substances.

Accordingly, Underwriters had sufficient information to conclude that such damages

**might** fall within the coverage for:

> Any and all liability imposed by law against the Assured for loss of or
> damage to or destruction of property of others . . . sustained or alleged to
> have been sustained during the currency of this Certificate and arising from
> **any cause whatsoever out of the operations, activities, and work
> and/or business of the Assured in the United States** . . . in connection
> with the Assured's business . . . consisting principally of cement
> manufacturing and aggregates . . . .

(Doc. # 74 at 14) (emphasis added).

Additionally, Underwriters have not met their "heavy burden" of showing that the

allegations in the EPA's PRP letter could not implicate the coverage in the Underwriters

policies. *See DISH Network*, 659 F.3d at at 1015 ("the insured need only show that the

underlying claim may fall within policy coverage; the insurer must prove it cannot."
(quoting *Cyprus*, 74 P.3d at 301)). As a consequence, the Court finds that Underwriters breached their duty to defend Holcim by failing to contribute to its defense prior to June 8, 2018.

## E.    INSURERS' CONTRIBUTION

Having determined that Underwriters breached their duty to defend Holcim, the Court must consider two issues. First, Holcim argues that the insurers are jointly and severally liable for its defense. Second, Hartford and Travelers argue that they are entitled to equitable contribution from Underwriters for Holcim's defense costs.

### 1.    Joint and Several Liability: Insurers' Obligation to the Insured

Holcim asserts that "[n]o matter what disputes the insurers may have between [sic] themselves concerning contribution or allocation, they are each jointly and severally liable for a prompt, full and complete defense . . . ." (Doc. # 81 at 19.) Hartford and Travelers, on the other hand, argue that the Court should defer ruling on this matter, and Travelers argues that the issue may raise a conflict between Washington and Colorado law. The Court agrees with Holcim.

As a preliminary matter, the Court is persuaded by rulings in the District of Colorado which have concluded that it is "unremarkable" that "the duty to defend among insurers whose policies [are] triggered is joint and several" under Colorado law. *D.R. Horton, Inc. - Denver v. Mountain States Mut. Cas. Co.*, No. 12-CV-01080-RBJ, 2013 WL 6169120, at *4 (D. Colo. Nov. 25, 2013). As Judge Jackson explained in *D.R. Horton*,

> A joint and several duty to defend does not stick one insurer with the whole tab. . . . [W]here more than one insurer has a duty to defend, but an insurer believes it has paid a disproportionate share of the defense costs, the respective shares ultimately to be borne by each triggered policy can be determined in litigation among the insurers if they cannot resolve the apportionment by agreement. . . . However, the insured is not required to remain undefended while the insurers fight it out as to their respective shares. Nor, of course, need the insured wait until the underlying liability is determined before it is provided a defense.

*Id.* (citations omitted); *see, e.g.*, *Travelers Indem. Co. of Am. v. AAA Waterproofing, Inc.*, No. 10-CV-02826-WJM-KMT, 2014 WL 201726, at *2 (D. Colo. Jan. 17, 2014) ("[A] liability insurer's duty to defend is a joint and several duty, such that an insurer who breaches this duty can be found liable for the entire amount of defense fees and costs, and that insurer can then seek equitable contribution from any co-insurers owing the same duty to defend.").

Moreover, there is no conflict between Colorado and Washington law on this point.[8] *See, e.g.*, *Kitsap Cty. v. Allstate Ins. Co.*, No. C93-5574R, 1995 WL 423912, at *13 (W.D. Wash. Mar. 28, 1995) (analyzing Washington law and concluding that "the duty to defend is joint and several . . . ."). Therefore, the Court concludes that the insurers—Underwriters, Hartford, and Travelers—are under a joint and several duty to provide Holcim with a complete defense.

---

[8] The Court notes that Travelers argues that there is, in fact, a conflict of law because federal courts in the District of Colorado have incorrectly predicted how the Colorado Supreme Court would rule on the issue of joint and several liability. (Doc. # 100 at 16.) However, the Court finds the reasoning behind the decisions in this District to be sound and persuasive.

2.    <u>Equitable Contribution: Insurers' Obligation to Each Other</u>

"Equitable contribution is recognized under Colorado law and is a means of apportioning a loss between two or more insurers who cover the same risk so that each insurer pays its fair share of the common obligation." *Gebremedhin v. Am. Family Mut. Ins. Co.*, No. 13-CV-02813-CMA-NYW, 2015 WL 1539600, at *9 (D. Colo. Mar. 31, 2015) (quoting *Cont'l W. Ins. Co. v. Colony Ins. Co.*, 65 F. Supp. 3d 1075, 1084 (D. Colo. 2014)). Granting equitable remedies lies within the discretion of the trial court. *Id*. (citing *La Plata Med. Ctr. Assocs., Ltd. v. United Bank of Durango*, 857 P.2d 410, 420 (Colo. 1993) (citing Restatement (Second) of Contracts § 357 cmt. c (1981))).

Generally, equitable contribution is available to an insurer who paid for an insured's defense and then seeks contribution from any co-insurers owning the same duty to defend. "Without equitable contribution, an insurer could be rewarded for refusing to honor its contractual obligation to its insured." *Gebremedhin*, 2015 WL 1539600, at *9 (citing *Allstate Ins. Co.*, 2011 WL 11065655, at *3). Relevant here, a "participating insurer is entitled to equitable contribution from a non-participating insurer, both having a duty to defend, when the former provides a complete defense to an insured against a common risk . . . arising throughout the successive coverage periods of both insurers." *Cont'l W. Ins. Co.*, 65 F. Supp. 3d at 1086; *see, e.g.*, *Am. Builders Ins. Co. v. ProBuilders Specialty Ins. Co., RRG*, No. 16-CV-1832-WJM-CBS, 2017 WL 4856860, at *7 (D. Colo. June 30, 2017); *Allstate Ins. Co. v. W. Am. Ins. Co.*, No. 09-CV-00967-RBJ-MJW, 2011 WL 11065655, at *3 (D. Colo. Nov. 21, 2011) (stating there

is potentially a claim for equitable contribution when an insurer settled all claims against its insureds and those claims triggered coverage by another insurer).

Additionally, the Colorado Supreme Court has allowed insurers who voluntarily defend an insured to receive contribution from a co-insurer who breached its duty to defend. *Nat'l Cas. Co. v. Great Sw. Fire Ins. Co.*, 833 P.2d 741 (Colo. 1992). In *Great Southwest*, the court noted that "the majority of courts that have decided this issue permit an insurer that voluntarily pays more than its share of a loss to demand contribution from a second insurer." *Id*. at 747. Thus, "Colorado law recognizes that primary coverage insurers 'are duty bound to defend the insured and are required to contribute their pro rata share' to the defense costs." *Signature Dev. Cos., Inc. v. Royal Ins. Co. of Am.*, 230 F.3d 1215, 1219 (10th Cir. 2000) (quoting *Great S.W.*, 833 P.2d at 747–48).

In the instant case, both Hartford and Travelers argue that the insurers' pro rata share of the defense costs should be determined based on a "time on the risk" ("TOR") basis. (Doc. # 82 at 20; Doc. # 84 at 20.) However, although an insurer's TOR is a factor that courts may consider in apportioning contribution for defense costs, *see Ky. League of Cities Ins. Servs. Ass'n v. Argonaut Great Cent. Ins. Co.*, No. 5:11-CV-00187, 2013 WL 120013 (W.D. Ky. Jan. 8, 2019), "[t]he appropriate method of allocation can be based on a variety of methods including, but not limited to, equal shares or based on policy limits," *Cont'l W. Ins. Co.*, 65 F. Supp. 3d at 1086 (allocating proportional share of defense costs). *See, e.g.*, *AAA Waterproofing*, 2014 WL 201726, at *3 (rejecting policy limits allocation method as unworkable under the circumstances and finding equal

shares method would result in the most equitable allocation when each insurer had joint and several duty to provide a complete defense).

This Court is not currently persuaded that a TOR method of allocation is appropriate because the time the "risk" arose is not specified by the EPA, and because the parties dispute which Underwriters policies are implicated. *See* (Doc. # 100 at 12 n.1) (noting that "Underwriters may have also issued an insurance policy to Ideal Cement during the period from 1955–1958."). Moreover, courts have held that "the allocation of defense costs is a matter to be worked out among the insurers and, if they cannot do so, then by a court." *D.R. Horton, Inc. - Denver v. Mountain States Mut. Cas. Co.*, No. 12-CV-01080-RBJ, 2013 WL 674032, at *3 (D. Colo. Feb. 25, 2013). Therefore, although the Court finds that Underwriters must contribute their pro rata share of Holcim's defense costs, the Court abstains from ruling on the method by which Underwriters should contribute their share. If the parties cannot resolve the matter during the upcoming mediation contemplated by the case plan approved by Magistrate Judge Wang, the Court will rule on the proper method of allocation after the insurers have an opportunity to brief the issue.

## IV.    CONCLUSION

Based on the foregoing, the Court ORDERS as follows:

- Underwriters' Motion for Summary Judgment (Doc. # 73) is DENIED;

- Holcim's Cross Motion for Summary Judgment (Doc. # 81) is GRANTED: the insurers—Underwriters, Hartford, and Travelers—are under a joint and several

obligation to provide Holcim with a complete defense, and Underwriters breached

that duty when they denied all defense costs prior to June 8, 2018;

- Hartford and Travelers' Cross Motions for Summary Judgment (Doc. ## 82, 84) are GRANTED IN PART AND DENIED IN PART. The Motions are GRANTED in that the Court finds that Underwriters must contribute to Holcim's past and future defense costs. The Motions are DENIED in that the Court abstains from ruling on the exact method by which Underwriters must satisfy their contribution obligation.

DATED: August 5, 2019

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge